321 P.2d 631

Ufemia M. MAESTAS, Administratrix of the Estate of Jose M. Maestas, Deceased, Plaintiff-Appellee,

v.

Ace CHRISTMAS, Jr., Defendant-Appellant.
No. 6195.

Supreme Court of New Mexico.
Feb. 4, 1958.

448

E. Forrest Sanders, Las Cruces, David Chavez, Jr., Santa Fe, for appellant.

Joseph M. Montoya, Edwin L. Felter, Santa Fe, for appellees.

SWOPE, District Judge.

This is an appeal from a judgment entered by the District Court of Santa Fe County in an action by the plaintiff under the wrongful death statute in which she was awarded a recovery against defendant by the jury. The appellant here was the defendant below and the appellee, who is the widow and administratrix of the estate of Jose M. Maestas, deceased, was the plaintiff. The parties will be designated here as they were below.

This action arose out of an accident which occurred on October 31, 1953, in Cebolla, New Mexico, which is a village located in Rio Arriba County on U. S. Highway 84, when an automobile being driven by the defendant collided with Maestas, who was a pedestrian, thereby causing his death. The action was originally filed in Rio Arriba County but, by stipulation of the parties, was tried in Santa Fe County.

The evidence shows that on October 31, 1953, Maestas and Frank Villalovas were scheduled to collect tickets and to operate the projector, respectively, at the showing of a motion picture to be held that night at the school house in Cebolla. Therefore,

after having supper early that evening, Maestas, Villalovas and Maestas' daughter, who planned to attend the movie, left for Cebolla from Maestas' home, which was located about six miles from Cebolla, in an automobile being driven by Villalovas.

Upon arriving at Cebolla, Villalovas stopped to obtain gasoline at a filling station located near the center of the village on the west side of U. S. Highway 84. Maestas then got out of the automobile, taking with him a cigar box he intended to use later in connection with collecting the tickets, and walked across the Highway to a Bar located on its east side. At that time the stretch on Highway 84 which went through Cebolla had been designated by the New Mexico State Highway Department as no-passing zone and, accordingly, three lines, a broken white line with two solid yellow lines on each side of it, had been painted down the center of the Highway by employees of the Department.

After obtaining the gasoline, Villalovas and Maestas' daughter continued on to the school house which, like the bar, was located across the highway on the east side within walking distance north of the bar, Maestas entered the bar about 7:00 p.m. and engaged in conversation with several friends he had not seen for some time. Although Maestas was a long-time resident of that area, he had been away herding sheep in Utah. Finally, Maestas purchased a pint of whiskey, with the financial aid of his friends, and invited some of his friends to join him in having a drink. While in the bar, Maestas danced a jig and also attempted to persuade one of his friends to attend the movie and, when he refused, engaged in a friendly scuffle with him. The bar owner then suggested that Maestas go to the school and collect the tickets whereupon at about 7:30 p.m., Maestas left the bar with his cigar box and the pint bottle which was still about half full of whiskey. As he left the bar, he stated that he was going to the school house to sell tickets.

At about the same time, the defendant was driving his station wagon in a southerly direction on U. S. Highway 84. He had been attempting to pass a slow moving pick-up truck for several miles but had been unable to do so because of the hills and on-coming traffic. The headlights on both vehicles were on as it was dark. Upon reaching the straight stretch of highway through Cebolla, the defendant increased the speed of his automobile and crossed from the right to the left lane over the yellow no-passing lines, which he claims he did not see for some unexplained reason, and had pulled up even with the pick-up truck in the process of passing it when he suddenly saw Maestas about three feet in from the left edge of the paved portion of the highway. He claims that Maestas was not looking to the left or right, and that, in spite of the fact that the defendant immediately applied his brakes causing the tires

to make a loud noise and swerved to the right as soon as he was able to do so as a result of the pick-up moving forward in the right lane, Maestas continued to walk directly west across the highway, neither looking to the left or right, and was finally struck about one and one-half feet left of the center line with the left side of defendant's station wagon. The defendant admitted, however, that he never sounded his horn and that prior to the accident Maestas apparently saw the pick-up truck in the right lane and did not see the defendant or anticipate that defendant would attempt to pass the pick-up at that point in the left lane. Apparently, Maestas died instantly as a result of his injuries consisting, among other things, of a fractured skull and neck and a compound fracture of the left leg. It should be noted, as pointed out by the plaintiff, that the physical facts conflict with the defendant's claim that Maestas was walking across the highway and indicate that he probably was walking north towards the school house when he was struck.

There are two principle questions involved in this appeal. The first one involves certain instructions given by the trial court to the jury to the effect that if they found from a preponderance of the evidence that the defendant had turned from the right driving lane of the highway over into the left driving lane at a place which was marked by appropriate markings by the New Mexico State Highway Department to indicate there was a no-passing zone, and that such markings were visible to an ordinarily observant man, then the jury should find the defendant guilty of negligence per se. The defendant claims that these instructions were erroneous and prejudicial because, even assuming that he did commit these acts, he did not violate any law and, for that reason could not have been guilty of negligence per se. In this connection, § 64–18–14, N.M.S.A.1953 provides as follows:

"The state highway commission is hereby authorized to determine those portions of any highway where overtaking and passing or driving to the left of the roadway would be especially hazardous and may by appropriate signs or markings on the roadway indicate the beginning and end of such zones and when such signs or markings are in place and clearly visible to an ordinarily observant person every driver of a vehicle shall obey the direction thereof."

The record also shows that after the enactment of the above statute and prior to the accident involved here, the New Mexico State Highway Department had promulgated certain rules and regulations which set forth the type, size, color and meaning of the various traffic control markings that would be used by the department on the highways but, at the time of the ac-

cident these rules and regulations had not been filed with the librarian of the New Mexico Supreme Court Library. Among other things, these rules provide that all no-passing zones in opposite directions will be marked with a solid yellow barrier line on each side of a broken white line as was done in the present case. The defendant argues that, under the provisions of §§ 4–10–13 through 4–10–19, N.M.S.A.1953, rules and regulations of the various state departments are not effective until they have been filed with the librarian. However, a careful reading of these statutes reveals that they do not provide that all unfiled rules and regulations are ineffective but merely provide that such rules and regulations shall not be valid as against any person who does not have actual knowledge of their contents. Therefore, since the defendant admitted at the hearing that he understood the significance of yellow barrier lines on the highways and that they designated no-passing zones, his argument that he did not violate the law and was not guilty of negligence per se has no merit. As a matter of fact, the only excuse the defendant offered at the hearing for his acts was that he had not seen the lines. Even assuming this was true, that would be no excuse because the lines were clearly visible and it was his duty to be certain that there were no barrier lines on the highway before he turned into the left lane where he struck and killed Maestas. See Ortega v. Koury, 55 N.M. 142, 227 P.2d 941.

The defendant also claims that the trial court erred in giving certain other instructions but after carefully studying all of the instructions, we find that no prejudicial errors were committed.

The remaining question involved in this appeal is whether or not a proper foundation was laid for the admission of certain impeachment testimony which was excluded by the trial court. Inasmuch as one of the defenses asserted by the defendant was that Maestas was intoxicated, a number of witnesses testified as to Maestas' action during the day in question, especially as to his conduct and behavior in the bar. The witnesses were more or less in agreement as to his acts and behavior in the bar, but there was a difference of opinion as to whether he was sober or intoxicated when he left the bar. One of the witnesses was Leo Martinez who happened to be in the bar on the night of the accident. He described the behavior and conduct of Maestas in some detail and also what occurred after the accident. During his testimony the following questions were asked and answers given:

"Q. Now, do you remember Simon Martinez, the Justice of the Peace there at Tierra Amarilla? A. Yes, I saw him after they call him in.

"Q. He was there that night? A. Yes, after the accident happened. They called the people, the law from Tierra Amarilla, and he came in.

"Q. And he was investigating the affair also, the accident? A. Who, Simon?

"Q. Simon, yes. A. I guess so.

"Q. But you did talk to him, didn't you? A. No, I didn't.

"Q. Didn't you talk to Simon Gonzales? A. Well, I don't remember; maybe I did talk to him. I don't remember whether I did or not. I saw him there.

"Q. Mr. Martinez, what would you say as to the condition of the deceased when he was in the bar. Was he drunk? A. No, sir.

"Q. Would you say he was not drunk? A. I would say that he was not drunk, yes, sir.

"Q. Now, do you know this gentleman over here (pointing to someone)? A. Yes, sir.

"Q. Did you ever see him before? A. Yes, sir.

"Q. Did you have a conversation with him on one occasion? A. I saw him at my house one time.

"Q. He came to your house and asked you what you knew of the matter and you told him? A. Yes, sir.

"Q. And didn't you tell him, and didn't you tell Simon Martinez, that the deceased had left Mr. Maes's bar · kind of drunk?

"Mr. Felter: Just a moment. I object because that's hearsay and it can't be used as an admission against interest because he's not a party.

"Mr. Chavez: Well,—

"The Court: Just a minute, Mr. Chavez. Your counsel wants to speak to you. (Pause) If you'll start over again."

Cross-Examination by Mr. Chavez continued:

"Q. All right. Mr. Martinez, didn't you tell Mr. Simon D. Martinez that night that the deceased, Jose Maestas, had left Mr. Maes's bar kind of drunk? A. No, I didn't.

"Mr. Felter: I object. That's hearsay and it's incompetent for any purpose in this case.

"The Court: I will overrule the objection. The witness has answered."

██ Later in the hearing the defendant attempted to impeach Leo Martinez by reading into evidence a portion of the deposition of Simon D. Martinez, who had died prior to the hearing, in which he testified that Leo Martinez had told him on the night of the accident that when Maestas left the bar he was "kind of drunk", however, when the plaintiff objected upon the ground that no proper foundation had been laid for the introduction of such testimony the objection was sustained. We believe that the ruling was correct. This Court has laid down a

strict and fixed rule that before a witness may be impeached by proof of former contradictory statements, his attention must be first directed to what may be brought forward for that purpose. And, that this must be done with particularity as to time, place and circumstances so that he can deny it, or make any explanation intending to reconcile what he formerly said with what he is now testifying. See State v. Fletcher, 36 N.M. 47, 7 P.2d 936. It is obvious from a reading of the above quoted testimony of Leo Martinez that the rule was not complied with in this case. Among other things, it certainly was not made clear to Martinez that the night he was supposed to have made the statement was the night of the accident and not the time at his home.

Finding no errors in the record it follows from the foregoing that the judgment of the court below should be affirmed, and the cause remanded.

It is so ordered.

COMPTON and KIKER, JJ., concur.

LUJAN, C. J., and SADLER, J., not participating.

McGHEE, J., dissenting.

McGHEE, Justice (dissenting).

Following the submission by Judge SWOPE of a proposed opinion in this case, and which now has a majority, Justice SADLER circulated a memorandum, the major portion of which I quote and adopt as my dissent as follows:

"I doubt the correctness of the holding of the proposed opinion that a proper foundation was not laid for asking Leo Martinez if he did not make a purported statement to Simon Martinez, Justice of the Peace, the night of the decedent's death, the latter was 'kind of drunk' when he left the bar and proving that he did by deposition taken from Simon Martinez before his death.

"In the first place, counsel did not interpose the objection of want of a proper foundation until after the trial court had already overruled objection to the impeaching testimony of Simon Martinez, and admitted the answer of the witness. In the second place, the objection was not good even if timely made because there could be no doubt the impeaching question related to a statement of the witness to the Justice of the Peace in the course of the latter's investigation of the accident and death at the time and place it occurred.

"It impresses me, without doubt, that testimony elicited from the witness and the proposed impeaching testimony down to the trial court's first ruling related to a conversation between the witness and Simon Martinez. When counsel finally woke up and threw in the objection of no proper foundation, he spoke too late and without merit in his objection anyway.

"Undoubtedly the trial judge erred in finally refusing to admit the tendered proof

of prior inconsistent statement. It probably would not have changed the result, but who can say?

"Judge SWOPE has done a good job on presenting the opinion he has, but I do believe he applies too strict a rule in holding there was any confusion in the mind of Leo Martinez as to the time and place of the claimed contradictory statement. * * * Remember, the trial judge first let the impeaching question by but by a subsequent ruling kept it from the jury. I think he was right the first time."

I fully agree with what Justice SADLER said and therefore dissent. Justice SADLER has never indicated to me that he changed his mind.