698 P.2d 887

Julian JARAMILLO, Roberto Mondra-
gon and Maria Isabel Mondragon,
Plaintiffs-Appellants, Cross-Appellees,

v.

FISHER CONTROLS COMPANY, INC.,
Defendant-Appellee, Cross-Appellant,

and

Cotton Butane Company, Inc. and
Arrow Gas Company,
Defendants-Appellees.

Nos. 7363, 7377.

Court of Appeals of New Mexico.

Jan. 22, 1985.

Certiorari Denied April 12, 1985.

Janet Santillanes, Klecan & Santillanes, P.A., Albuquerque, for plaintiffs-appellants and cross-appellees.

Thomas J. McBride, David H. Stotts, Johnson and Lanphere, P.C., Albuquerque, for defendant-appellee and cross-appellant.

Jeffrey R. Brannen, Montgomery & Andrews, P.A., Santa Fe, for defendant-appellee Cotton Butane Co., Inc.

Saul Cohen, Sutin, Thayer & Browne, P.C., Santa Fe, for defendant-appellee Arrow Gas Co.

**OPINION**

WOOD, Judge.

Jaramillo purchased a gas regulator from Cotton Butane Company (Cotton). The regulator was manufactured by Fisher Controls Company (Fisher). The function of the regulator was to control the amount of propane gas moving from a tank of propane to an appliance. Arrow Gas Company (Arrow) had filled the propane tank. Jaramillo took the regulator to the home of his mother and stepfather, Isabel and Roberto Mondragon, in order to test a stove. He connected the regulator into a line between the tank and stove. A few seconds after opening the valve on the propane tank, Jaramillo heard a noise as if something had "given," became aware that gas was escaping and yelled for everyone to get out of the house. Jaramillo reentered the house looking for his son. After hearing that his son was outside, he decided to close the valve on the propane tank. An explosion occurred as he was closing the valve. A second explosion and fire also occurred. Jaramillo suffered personal injury; the Mondragons suffered property damage.

The case against Cotton and Fisher was submitted to the jury on a theory of products liability, and the case against Arrow was submitted on a theory of negligence. The jury attributed the cause of Jaramillo's personal injury and the Mondragons' property damage as fifty percent to Jaramillo, ten percent to Isabel Mondragon (Isabel) and forty percent to Fisher. Jaramillo, the Mondragons and Fisher appealed. We (1) identify the appellate posture of the case and divide our discussion of the issues into the following categories: (2) jury selection; (3) evidentiary rulings; (4) comparative fault rulings; and (5) computation of the Mondragons' judgment and assessment of costs.

**Appellate Posture**

Inasmuch as separate appeals were filed by plaintiffs and by Fisher, we consolidated

the appeals and ordered that Fisher be treated as a cross-appellant.

The issues involving jury selection, evidence and comparative fault are raised by Jaramillo and the Mondragons, who ask that judgment be entered in their favor for the full amount of their damages, without reduction for their negligence. Cotton and Arrow point out that the jury determined they were not liable to any plaintiff, and ask that the judgment in their favor be summarily affirmed. Plaintiffs respond that their alternative requested disposition was for a new trial. This alternative request would require us to determine which of plaintiffs' issues involve Cotton or Arrow should we remand for further proceedings. Such a determination is unnecessary because plaintiffs' appellate claims are without merit. Accordingly, in discussing the contentions of Jaramillo and the Mondragons, we do not determine against which defendant the contention is directed.

The issues involving the computation of the Mondragons' judgment and the assessment of costs are raised by Fisher in its cross-appeal. We decide those issues. Fisher raised additional issues but asks that the additional issues not be considered unless one or more of plaintiffs' issues are meritorious. Because plaintiffs' issues are without merit, we neither identify nor consider these additional issues in the cross-appeal.

## Jury Selection

■ Plaintiffs contend the trial court erred in failing to excuse five prospective jurors for cause. We assume five were challenged even though we have found only four challenges in the transcript.

One of the five was excused on grounds separate from the challenge. Plaintiffs used peremptory challenges for three of the five. However, none of the five actually sat as a juror.

"A defendant cannot claim prejudice for failure to dismiss prospective jurors if he fails to exercise available peremptory challenges." *State v. Smith*, 92 N.M. 533, 540–41, 591 P.2d 664 (1979). Plaintiffs ignore the fact that they did not use all of their peremptory challenges. They assert, citing *State v. Sims*, 51 N.M. 467, 188 P.2d 177 (1947), that "[i]t is reversible error for a trial judge to refuse to excuse a juror for cause if a juror is disqualified by bias from sitting on the panel." In *Sims* the disqualified person sat as a juror; in this case none of the persons challenged sat as a juror.

Plaintiffs make a generalized claim of prejudice, but they do not assert that "the jury, which finally heard the case, was in any way biased, prejudiced or unfair." *State v. Martinez*, 95 N.M. 445, 450, 623 P.2d 565 (1981); *see also State v. Gonzales*, 82 N.M. 388, 482 P.2d 252 (Ct.App.1971). Plaintiffs' claim is meritless.

## Evidentiary Rulings

### A. Fisher's Testing Procedures

■ Over the objection of plaintiffs, the trial court permitted Fisher to introduce evidence as to its testing procedures for regulators of the type purchased by Jaramillo.

Plaintiffs contend this evidence was improperly admitted under strict products liability law because a manufacturer is liable for injuries caused by a defective product even if the manufacturer has exercised all possible care during manufacture. *See* NMSA 1978, UJI Civ. 14.6 (Cum.Supp. 1984), which was given, and *Grammer v. Kohlaas Tank & Equipment Co.*, 93 N.M. 685, 604 P.2d 823 (Ct.App.1979). The evidence was not admitted to show care, or the absence of negligence, on Fisher's part. Plaintiffs sought recovery from Fisher on the basis of products liability; one of the theories of liability submitted to the jury was that there was a defect in the regulator. The trial court admitted the evidence on the question of the existence of a defect when the regulator left Fisher's control. *See Perfetti v. McGhan Medical*, 99 N.M. 645, 662 P.2d 646 (Ct.App.1983).

In *Livingston v. Begay*, 98 N.M. 712, 652 P.2d 734 (1982), plaintiff sought recovery from Montgomery Ward on a theory of products liability in supplying a defective

heater. *Livingston* held that summary judgment in favor of Montgomery Ward was proper inasmuch as it made "a prima facie showing that the heater was not defective when sold, and since the opposing parties have failed to present any contrary evidence * * *." 98 N.M. at 717, 652 P.2d 734. The showing of "no defect" was (1) the heater had been tested prior to sale and approved as safe; and (2) there was no direct evidence of a design or manufacturing defect. *Livingston* established that evidence of testing procedures may be introduced in a case involving a defect. The question is when the testing procedures are admissible.

*Brown v. General Foods Corp.,* 117 Ariz. 530, 573 P.2d 930, 934 (Ct.App.1978) states:

It should be noted that a manufacturer will rarely have available anything other than circumstantial evidence to disprove a plaintiff's claim relating to the discovery and existence of an alleged defect in a product. The circumstantial evidence is admissible, not to show lack of fault or the presence of due care on the manufacturer's part, but rather, as relevant evidence tending to show the improbability of the defect as alleged by the plaintiff. We can hypothesize a fact situation in which, by reason of the intrinsic nature of the defect and the impossibility of its occurrence other than in the manufacturing process, evidence of the manufacturer's quality control procedures would not be relevant and therefore would be inadmissible. However, such is not the case before us. The presence of the banana peel in the cereal box was not a defect of such a nature that it had to have occurred before the product left the possession and control of the defendant-manufacturer.

*See also Johnesee v. Stop & Shop Companies,* 174 N.J.Super. 426, 416 A.2d 956 (1980).

Although testing procedures may be admissible, plaintiffs assert those procedures were not relevant in this case. We disagree.

Only two components of the regulator survived the explosion and they were distorted in the fire. There was no direct evidence that the regulator was defective. Plaintiffs' evidence of a defect came from expert testimony based on circumstantial evidence. Fisher's evidence of testing procedures, also circumstantial, was to show that the defects postulated by plaintiffs' expert would not have passed any of Fisher's tests. Fisher's evidence tended to show that no defect existed; it was relevant. NMSA 1978, Evid.R. 401 (Repl. Pamp.1983).

**B. New Mexico Liquefied Petroleum Gas (LPG) Code**

Propane, defined to be a liquefied petroleum gas, is regulated by the Liquefied Petroleum Gas Bureau, which has authority to adopt rules and regulations. NMSA 1978, §§ 70–5–4 and –5. Plaintiffs do not assert an absence of rules and regulations concerning the storage and handling of LPG. Fisher introduced evidence during cross- or recross-examination that the installation at the Mondragon home was in violation of the rules and regulations. Plaintiffs assert this testimony was improper for the three reasons discussed under this issue.

**(1) Relevancy**

Legislatively authorized rules and regulations have the force of law. *Brininstool v. New Mexico State Board of Education,* 81 N.M. 319, 466 P.2d 885 (Ct.App. 1970). Violation of a properly adopted and filed rule or regulation is negligence per se. *Maestas v. Christmas,* 63 N.M. 447, 321 P.2d 631 (1958); *cf. State v. Joyce,* 94 N.M. 618, 614 P.2d 30 (Ct.App.1980).

Plaintiffs claim that testimony concerning violation of the rules and regulations was irrelevant because the testimony went to negligence per se on the part of Jaramillo, and his negligence was not relevant in a products liability claim. This is incorrect. *See Marchese v. Warner Communications, Inc.,* 100 N.M. 313, 670 P.2d 113 (Ct.App.1983). We discuss this further

under the heading "Comparative Fault Rulings."

### (2) Knowledge of the Rules and Regulations

Plaintiffs assert that testimony going to violation of the rules and regulations was improper because "[t]he gas code was merely an administrative regulation which was not promulgated to the public. According to L.P.G. witnesses, the Plaintiff [Jaramillo] could not be expected to have any knowledge of the regulations." Plaintiffs seem to be arguing that if Jaramillo lacked knowledge of the rules and regulations they may not be used to measure the propriety of his conduct. We disagree.

 The rules and regulations, having the force of law, *Brininstool,* imposed the standard and imposed upon Jaramillo the duty of complying with the standard. *See Sanchez v. J, Barron Rice, Inc.,* 77 N.M. 717, 427 P.2d 240 (1967). His ignorance does not excuse noncompliance with the standard and did not make the testimony inadmissible. *See State v. Carr,* 95 N.M. 755, 626 P.2d 292 (Ct.App.1981); *State v. Montoya,* 91 N.M. 262, 572 P.2d 1270 (Ct. App.1977).

### (3) Improper Questions

 Plaintiffs state: "Defendants were allowed to argue the law throughout the case by repeatedly asking witnesses whether the regulator installation violated the law * * *." They also state: "Defendants were allowed, over objection, to question witnesses about specific portions of the rules and the witnesses['] interpretation of the rules." "It was not the function of the witnesses to state whether Plaintiff broke the law."

Transcript references are given as support for the above claims. However, plaintiffs do not identify the context of the questions they assert were objectionable. We first consider the context. *Cf. Payne v. Tuozzoli,* 80 N.M. 214, 453 P.2d 384 (Ct.App.1969).

The rules and regulations involved are referred to in trial testimony as NFPA–58, identified by plaintiffs' expert witness Feldman as the National Fire Protection Association Rules. Both the record and the trial testimony indicate that NFPA–58 was adopted as a rule in New Mexico.

Feldman testified that NFPA–58 applied to Jaramillo's installation and that an installation like Jaramillo's violated NFPA–58. Feldman also testified as to several specific violations of NFPA–58. This testimony came in during the cross-examination of Feldman by Fisher. Feldman also testified concerning "reasonably prudent conduct" and that any individual could install a propane system in his or her home. On recross, Fisher was permitted to question Feldman as to prudent conduct and the certification requirements of "Property-owner installed systems" under NMSA 1978, Section 70–5–6(B). Over plaintiffs' objection, the trial court permitted Fisher's questioning on the basis that it was proper to test Feldman's knowledge, *see* NMSA 1978, Evid.R. 705 (Repl.Pamp.1983), and that the questions did not invade the "province of the jury," *see* NMSA 1978, Evid.R. 704 (Repl.Pamp.1983).

Plaintiffs' transcript references go to a small portion of the testimony of Feldman, but most of the references are to questioning of witnesses who testified after Feldman. All involve testing the knowledge of plaintiffs' several experts. We agree that Fisher's questioning of these experts was proper under Evid.Rules 704 and 705. This answers plaintiffs' contention concerning the questioning of Feldman. There are additional reasons there was no error in the questioning of the subsequent witnesses.

Plaintiffs have not attempted to demonstrate how any particular question harmed them. Accordingly, we do not set forth the questions appearing in their transcript references. Having reviewed those references, the questions were not error under one or more of the following grounds:

(a) There was no proper objection. NMSA 1978, Civ.App.R. 11 (Repl.Pamp. 1984).

(b) The questions were repetitive of questions answered by Feldman, but plaintiffs did not object on the basis of cumulative evidence. NMSA 1978, Evid.R. 403 (Repl.Pamp.1983).

(c) The questions were in response to questions by plaintiffs as to the meaning and coverage of NFPA–58; specifically, the matter had been opened up by questions asked by plaintiffs' attorneys, either on direct or redirect. The questions were proper cross- or recross-examination under NMSA 1978, Evid.Rule 611(b) (Repl.Pamp. 1983). As an example, plaintiffs' expert witness Boggess testified twice on direct examination that he was familiar with NFPA–58, and testified on direct to at least one violation of that rule. Questioning of Boggess as to his knowledge of pressure requirements in NFPA–58 was proper cross-examination under both Evid.Rule 611(b) and NMSA 1978, Evid.Rule 703 (Repl.Pamp.1983).

Fisher's questioning tended to show that Jaramillo's conduct was not in accord with the legal standard. The questioning also tended to show the knowledge, or lack thereof, of plaintiffs' experts who testified as to defects and causation. This information was properly before the jury for its use in deciding the facts of the case. The questioning was not improper.

### C. Testimony That the Regulator Was Installed Backward

Langhorst, an investigator for the State Fire Marshal, was permitted to testify over plaintiffs' objections that shortly prior to the first explosion, Jaramillo stated that the regulator was backward. Langhorst's testimony, as to the regulator being backward, came in by the reading of his handwritten field notes from his investigation on the day of the fire. Plaintiffs contend that the reading of the notes to the jury was error because of hearsay. We do not identify all the arguments of the parties for or against admissibility; rather, we identify the evidence rules under which the testimony was admissible.

Langhorst did not hear the remark attributed to Jaramillo. According to Langhorst, he was informed of the remark by Gerry, the sister of Jaramillo. Thus, our analysis involves three steps.

■ Gerry, a witness for plaintiffs, testified on direct examination that shortly prior to the explosion Jaramillo "said something about turning back assward." The context is that this remark occurred either while Jaramillo was connecting the regulator into the propane line in the utility room adjacent to the kitchen or shortly after the connection was made. Gerry's testimony was proper; Jaramillo's remark was an admission of a party opponent, and not hearsay under NMSA 1978, Evid.Rule 801(d)(2) (Repl.Pamp.1983).

■ Langhorst testified that Gerry informed him of Jaramillo's remark. Gerry testified at the trial and was cross-examined concerning the statement. Gerry's statement was not hearsay if the statement was inconsistent with her trial testimony.

At trial, Gerry had no recollection of ever talking with anyone from the State Fire Marshal's office and denied that on the day of the fire that she had told Langhorst that Jaramillo had said the regulator was in backwards. This denial of a conversation with Langhorst is inconsistent with Langhorst's testimony, but it is not inconsistent trial testimony by Gerry.

The inconsistency is that at trial Gerry characterized Jaramillo's remark as about something "turning back assward." According to Langhorst's note, " 'He said that the regulator was backward * * *.' " The statements are inconsistent; the difference is between something turning backward and the regulator being installed backwards. Plaintiffs' cross-examination of Langhorst suggested that Jaramillo's remark should be understood as referring to fittings on the regulator that turned backwards. Gerry's statement to Langhorst was not hearsay under NMSA 1978, Evid. Rule 801(d)(1) (Repl.Pamp.1983).

Plaintiffs assert that Evid.Rule 801(d)(1) is not applicable because Langhorst was

uncertain of the identity of the person making the remark. This argument overlooks Langhorst's testimony, before the jury, that he was certain that it was Gerry that informed him of Jaramillo's remark. This testimony of identity sufficiently distinguishes *Torres v. Sierra,* 89 N.M. 441, 553 P.2d 721 (Ct.App.1976), on which plaintiffs rely.

■ Gerry's statement was recorded in Langhorst's field notes, and those notes were read to the jury. Plaintiffs assert the reading of the field notes was error because the notes were hearsay. Langhorst testified to the foundational requirements for the reading of the notes to the jury under NMSA 1978, Evid.Rule 803(5) (Repl. Pamp.1983), which deals with recorded recollection. *Cf. State v. Bazan,* 90 N.M. 209, 561 P.2d 482 (Ct.App.1977). His testimony also supplied the foundational requirement for admission of the notes under NMSA 1978, Evid.Rule 803(6) (Repl.Pamp.1983), which deals with regularly conducted activity. Thus, the reading of the notes to the jury was not excluded as hearsay by Evid. Rule 803.

■ Plaintiffs contend that the field notes were insufficiently reliable to be read to the jury or admitted as evidence under either Evid.Rule 803(5) or (6). Their argument proceeds on the basis that their view of the facts demonstrates error as a matter of law. They overlook the care with which the trial court considered Langhorst's foundational testimony and the circumstances under which Langhorst obtained the information contained in the field notes. The transcript shows an exercise of discretion by the trial court and evidence supporting the trial court's exercise of discretion. We cannot limit our review to plaintiffs' view of the facts. We hold there was no abuse of discretion by the trial court in permitting the reading of the field notes to the jury.

Plaintiffs assert the field notes were not admissible under Evid.Rule 803(6) because it was not Gerry's business to supply information contained in the notes. This argument is based on a misreading of the rule. The "regularly conducted business activi-

ty" portion of the rule applies to Langhorst. The "information transmitted by ... a person with knowledge" portion of the rule applies to Gerry. The rule does not require that Gerry be in the business of supplying information of the type contained in the notes.

### D. Jaramillo's Conduct

This issue involves four separate items of conduct. Plaintiffs characterize the trial court's rulings as to these items as permitting the defendants to attack Jaramillo's character. This is incorrect. Character evidence under NMSA 1978, Evid.Rule 404(a) (Repl.Pamp.1983) is not involved. What is involved is the credibility of Jaramillo, *see* NMSA 1978, Evid.R. 607 (Repl.Pamp.1983), the relevance of certain testimony, *see* Evid.R. 401, and the facts considered by a tendered expert, *see* Evid.R. 705. We consider each of the four items.

### (1) Prior Conviction

■ On cross-examination Fisher asked, and Jaramillo admitted, that he had pled guilty to shoplifting. This crime involved dishonesty. *State v. Melendrez,* 91 N.M. 259, 572 P.2d 1267 (Ct.App.1977). The question was proper for the purpose of attacking the credibility of Jaramillo. NMSA 1978, Evid.R. 609(a)(2) (Repl.Pamp. 1983). Jaramillo contends the shoplifting conviction was irrelevant. This is incorrect. The adoption of Evid.Rule 609 by the supreme court is tantamount to a determination that conviction of the type of crimes identified in the rule bears on credibility. *State v. Lucero,* 98 N.M. 311, 648 P.2d 350 (Ct.App.1982).

■ Plaintiffs also contend that the probative nature of the conviction was outweighed by its prejudicial impact upon the jury. *See* Evid.R. 403; *State v. Day,* 91 N.M. 570, 577 P.2d 878 (Ct.App.1978). The appellate question is whether the trial court abused its discretion in permitting the question concerning the prior conviction. *State v. Lucero.* Abuse of discretion occurs when the trial court's ruling is

"clearly against the logic and effect of the facts and circumstances before the court." *Id.* 98 N.M. at 314, 648 P.2d 350. Jaramillo was the only witness to the actual connection of the regulator and what happened during the test. These events are crucial. Jaramillo's testimony and credibility were of the utmost importance in the jury's determination. *Minor v. City of Chicago*, 101 Ill.App.3d 823, 57 Ill.Dec. 410, 428 N.E.2d 1090 (1981). In these circumstances there was no abuse of discretion, and Evid.Rule 403 did not require exclusion of the evidence. This disposition of the claim under Evid.Rule 403 also applies to Evid. Rule 403 claims made in connection with items 2 and 3.

**(2) Subsequent Conviction**

The explosion and fire occurred in April 1980. Fisher was permitted to ask whether and Jaramillo admitted that, on August 31, 1981, he was convicted of being under the influence of intoxicating liquor, reckless driving, disorderly conduct by using obscene and abusive language and failure to obey one-way street signs. Plaintiffs incorrectly claim this testimony was irrelevant. The above activities were relevant to and properly admitted as substantive evidence on the question of Jaramillo's "life expectancy and the number of years for which damages for permanent injury and pain and suffering should be assessed." *De La O v. Bimbo's Restaurant, Inc.*, 89 N.M. 800, 805, 558 P.2d 69 (Ct.App. 1976).

The above activities were also properly used to impeach Jaramillo. He failed to reveal the 1981 convictions when his deposition was taken, although he was asked questions that called for these convictions to be revealed. Thus, the question about the 1981 convictions was a proper attack on Jaramillo's credibility. His false answer at his deposition was a prior inconsistent statement. NMSA 1978, Evid.R. 613 (Repl.Pamp.1983).

**(3) Insufficient Funds Checks**

On cross-examination Jaramillo admitted that he "was asked to leave" an employment subsequent to the explosion and fire. He admitted there was a conflict between the manager and himself; he denied that insufficient funds checks were a reason for his termination. Fisher proposed to impeach Jaramillo by prior inconsistent statements and to offer deposition testimony of the manager that "bad checks" were a part of the reason for the termination. The trial court indicated that the reason for the termination was relevant to the claim of lost earnings because the reason was "an explanation that jobs were terminated for noninjury related reasons subsequent to the accident * * *." Thereafter, the parties agreed upon the information to be given to the jury. The jury was told that the testimony of insufficient funds checks was admitted to show a possible reason for termination, that this testimony was not a reflection on Jaramillo's character and "there were no criminal ramifications to the matter." Subsequently, the manager was called as a witness by Fisher and examined and cross-examined as to Jaramillo's employment, his duties, his termination and the "bad checks."

Jaramillo's claim that evidence of the insufficient funds checks was irrelevant is incorrect. This evidence was tendered to show termination of employment was for noninjury reasons, and was relevant to the damage claim for lost wages. Any question of criminal conduct in connection with the checks was removed by the instruction that limited the evidence to its proper scope. NMSA 1978, Evid.R. 105 (Repl. Pamp.1983).

**(4) Cross-Examination of Jaramillo's Psychologist**

Jaramillo proposed to call a psychologist to testify as "to the psychological effects the fire, explosion and resulting injuries had on * * * Jaramillo * * *." Fisher informed the trial court that if the psychologist testified, Fisher proposed to cross-examine (a) as to what the psychologist was

told and not told, (b) as to what the psychologist considered significant and not significant and his reasons, and (c) in connection with the claimed "psychological" damages to "fully explore the bases for his opinion." There was an extensive tender; Fisher's tendered cross-examination was along the lines proposed. The tendered cross-examination brought out that Jaramillo had told the psychologist of his conviction for possession of heroin; that the psychologist did not consider Jaramillo's attitude toward the conviction as relevant to a psychological evaluation; that Jaramillo had not told the psychologist about the items discussed under (1), (2) and (3) of this issue; that if what Jaramillo told the psychologist differed from what Jaramillo testified to under oath this "might" make a difference to the psychologist in giving credence to what Jaramillo had told the psychologist. The psychologist stated that Jaramillo's inaccuracies, inconsistencies and mistakes of reporting were not germane.

The trial court ruled that if the psychologist testified that Jaramillo could not function as he did prior to the accident then Fisher could cross-examine "as to events that are supported by the evidence that are reasonably related in time and circumstance to the event in question." After this ruling, Jaramillo's counsel announced the "withdrawing" of the psychologist as a witness.

The psychologist's name was Foote. Plaintiffs state:

> Based on Dr. Foote's testimony that in his professional opinion the prior drug use and incarceration were irrelevant to his psychological evaluation, Plaintiffs contended that Defendants should not be able to introduce the drug use and other specific incidents through Dr. Foote. The trial court, however, ruled that if Dr. Foote testified any past acts of Plaintiff could be inquired into on cross-examination. * * * *Because* of that ruling Plaintiffs withdrew Dr. Foote as a witness * * and were deprived of his testimony. [Our emphasis.]

Plaintiffs conclude with a general claim of prejudice by the trial court's ruling.

We have pointed out that the psychologist was withdrawn as a witness after the trial court's ruling. However, we cannot say that the witness was withdrawn *because* of the ruling. There was more to the tendered cross-examination than incidents involving the conduct of Jaramillo; it included discrepancies between what Jaramillo told the psychologist and what was revealed by medical records as to what Jaramillo could or could not do. This aspect of the tendered cross-examination related directly to the damage claim. The psychologist may well have been withdrawn as a witness to avoid cross-examination as to this type of discrepancy. However, we decide this issue on the merits. We assume, but do not decide, that the psychologist was withdrawn as a witness because the trial court ruled that cross-examination would be permitted as to events reasonably related to Jaramillo's claim.

In connection with cross-examination of a defendant's character witness in a criminal case, *State v. Christopher,* 94 N.M. 648, 651, 615 P.2d 263 (1980), states:

> [T]he prosecutor is permitted to test the witnesses' grounds of knowledge. [Citations omitted.] If the witness knows of reputed prior bad acts of the defendant which do not affect his opinion, the witness may be discredited and if the witness does not know of reputed prior bad acts of the defendant which may be generally known in the community, the basis of the witness' opinion is deficient. *Inquiry into the basis of the witness' information, accuracy and credibility is almost universally admissible.* [Our emphasis.]

■ Cross-examination extends to matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief by the witness on direct examination. *State v. Wilcoxson,* 51 N.M. 501, 188 P.2d 611 (1948); *see State v. Garcia,* 78 N.M. 136, 429 P.2d 334 (1967). Evid.Rule 611(b) is not to the contrary.

The psychologist in this case was tendered as an expert witness. The expert is not to be sheltered from a testing of the basis of his opinion; rather, such a testing is expressly authorized. Evid.Rules 703 and 705; *see State v. Turner*, 81 N.M. 450, 468 P.2d 421 (Ct.App.1970).

Jaramillo may have been prejudiced by a searching cross-examination of the psychologist. The prejudice would have been to the credibility of the psychologist's testimony. "The fact that competent evidence may tend to prejudice [a party] is not grounds for exclusion of that evidence." *State v. Hogervorst*, 90 N.M. 580, 588, 566 P.2d 828 (Ct.App.1977).

## Comparative Fault Rulings

### A. Negligence in a Products Liability Case

Plaintiffs' brief-in-chief identifies this issue in general terms—that the trial court erred in ruling that a plaintiff's ordinary negligence is a defense in a products liability case. They refer us to the instruction given by the trial court which identified the theories of Fisher and Cotton that Jaramillo was negligent. They also refer us to their objections to the instruction: "We reiterate our objection to any and all instructions on negligence as incorporating the negligence concept into a products liability case."

In the brief-in-chief, plaintiffs relied on New Mexico decisions that did not specifically decide this general claim and on decisions of other jurisdictions that had decided the issue consistent with plaintiffs' general claim. The answer briefs of Fisher and Cotton relied principally on *Marchese v. Warner Communications, Inc. Marchese* states: "[P]laintiff's negligence is a partial defense to a products liability claim in that the percentage of plaintiff's fault, due to negligence, reduces the amount of damages that plaintiff may recover." 100 N.M. at 317, 670 P.2d 113. Instead of citing specific cases in support of this proposition, *Marchese* cited two texts where the supporting cases could be found. Woods, *The Trend Toward Comparative Fault* 20 *Trial* at 16 (Nov.1984) discusses more recent cases and states, at page 20: "[T]he ascendency of comparative fault seems inevitable."

In their reply briefs, plaintiffs attempt to change the issue, asserting that other portions of the instructions were error. We do not consider these arguments because they were not made in the brief-in-chief. "Such a procedure forecloses a response from appellees, and leaves them with an argument directed only toward what they were able to surmise from the ... point stated in the Brief-in-Chief." *Doe v. City of Albuquerque*, 96 N.M. 433, 436, 631 P.2d 728 (Ct.App.1981). An issue raised for the first time in the reply brief will not be considered. *Sanchez v. Bernalillo County*, 57 N.M. 217, 257 P.2d 909 (1953).

The reply briefs also discuss arguments in the answer briefs of Fisher and Cotton. These arguments need not be considered because they were presented as alternatives, in the event *Marchese* was not applied. We follow *Marchese*.

Plaintiffs contend that *Marchese* should not be followed because it had not been decided when this case was tried. Our answer comes from the court of appeals opinion adopted in *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234 (1981). That opinion had been adopted before the trial of this case. The opinion states, *see* 96 N.M. at 688, 634 P.2d 1234, that the effect of comparative negligence upon products liability claims was not decided, and that the court relied upon the capability of the trial judge to resolve such issues when confronted with special factual situations requiring adaptation of the rule of comparative negligence. The trial court resolved the problem in this case, instructing the jury (a) that defendants had the burden of proving that Jaramillo's alleged negligence was a proximate cause of the injury and resulting damages, and (b) "If you find that plaintiffs have proved any one of their claims, and that defendants have proved a defense to that claim, then you will determine the

degree to which the acts of each party contributed to cause the injury and resulting damages."

This instruction was consistent with *Scott v. Rizzo*. The trial court proceeded in accordance with *Scott v. Rizzo*. The fact that *Marchese* was decided after the trial of this case did not make the trial court's instruction erroneous, and did not make the rule adopted in *Marchese* inapplicable.

### B. Evidence That Isabel Was Negligent

■ The question of Isabel's negligence was submitted to the jury. Our discussion under this heading is limited to the question of whether there was such negligence. Plaintiffs contend there was no evidence of negligence. We disagree.

The stove that Jaramillo was testing was located in Isabel's home and was one that Isabel and Jaramillo were planning to use in their business known as La Belle's Catering. Isabel was present and cooking on a stove fueled with natural gas at the time of the test; thus there was an open flame. The cook stove and the stove being tested were in the same room. Isabel raised no objection to the circumstances of the test. The line from the stove being tested went into the adjacent room where the propane tank was located and where Jaramillo installed the regulator into the line. An exhibit indicates the distances involved were not great. Isabel had been in the food preparation business for several years and had experience in the use of propane fueled stoves. Jaramillo also had such experience but this experience had been acquired more than five years before. The testing occurred without any venting to the outside. There was evidence that the pressure in the tank was excessive for the hookup for the test, that a second regulator was needed. The foregoing is evidence of negligence on the part of Isabel.

■ Plaintiffs assert that the foregoing evidence of negligence on the part of Isabel was no more than a duplication of the fault assessed to Jaramillo. Plaintiffs conclude

that the jury was allowed "to assess fault against Plaintiffs twice for the same activity...." This is a non sequitur. Both Isabel and Jaramillo could be found negligent for their part in the testing. Moreover, their activity was not the same. Isabel continued to cook with an open flame during the test of equipment using propane, which, at a minimum, Isabel should have known to be dangerous because of her experience. Jaramillo conducted the test. There was evidence that his hookup was improper. In addition, there was evidence of separate negligence by Jaramillo in reentering the home after reaching a place of safety.

### C. How Isabel's Negligence Applies

Only Arrow identified a theory of negligence as to Isabel. Neither Fisher nor Cotton identified a theory of Isabel's negligence. On this basis plaintiffs raise two issues.

#### (1) Absence of Duty

Arrow's theory of Isabel's negligence was that (a) Isabel failed to adequately instruct and supervise Jaramillo in the use and operation of the regulator, and (b) Isabel negligently permitted Jaramillo to store, handle and attach the tank to a stove inside the house. Plaintiffs assert that, even if there was evidence of negligence as to these items, Isabel could not be held negligent as to Jaramillo because she owed no duty to Jaramillo. We need not decide the question of a duty owed to Jaramillo. However, *see* 2 *Restatement (Second) of Torts* § 318 (1965). The argument concerning a duty to Jaramillo is an attempt to misdirect the issue. Our inquiry is how the evidence of Isabel's negligence is to be applied.

■ Isabel had a duty to exercise ordinary care for her own safety and the safety of her property. NMSA 1978, UJI Civ. 16.4 (Repl.Pamp.1980). The jury was so instructed. It was also instructed as to the meaning of ordinary care, and negligence was defined with respect to the pres-

ence or absence of ordinary care. A plaintiff's recovery may be reduced on the basis of the plaintiff's breach of the duty to exercise ordinary care for the safety of the plaintiff's property. *Cf. Thomas v. Henson,* 696 P.2d 1010 (Ct.App.1984).

Arrow's theories of Isabel's negligence are predicated on the facts of the test made by Jaramillo and circumstances involving both Isabel and Jaramillo, but the viability of those theories are not dependent upon a duty to Jaramillo. Rather, the viability is based upon Isabel's duty to care for herself and her property.

### (2) Failure of Fisher and Cotton to Identify a Theory of Negligence

 Plaintiffs assert that neither Fisher nor Cotton can benefit from Isabel's negligence because neither Fisher nor Cotton identified a theory that Isabel was negligent. This disregards *Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 646 P.2d 579 (Ct.App.1982), and how the jury was instructed.

*Bartlett* holds that the jury is to determine the fault of all participants in the occurrence regardless of whether the participants are parties to the litigation. The reason is that damages are to be apportioned on the basis of fault. A special verdict was submitted to the jury which required it to consider the cause of the injuries to Jaramillo and the property damage to the Mondragon home. The jury considered the fault of Fisher and Cotton in terms of products liability. It considered the fault of Arrow, Jaramillo and Isabel in terms of negligence. In addition, it considered the fault of Allan Kossman, a nonparty, and any other party in terms of negligence. The special verdict covered the fault of participants in the occurrence that caused the damage to plaintiffs. This was proper under *Bartlett* and under the evidence.

The determination of the fault of all participants depends on the evidence showing fault or nonfault by the participants. The determination does not depend on pleading or whether a party identified a theory in

requested instructions; it cannot. Participants who are not parties neither plead nor submit requested instructions. The jury properly assessed Isabel's percentage of fault; the fact that Fisher and Cotton failed to submit a theory of Isabel's negligence in their requested instructions did not prohibit the jury from making that assessment.

### Computation of the Mondragons' Judgment and Assessment of Costs

The jury determined that the total damage to the Mondragons was $190,000; the amount is not challenged. State Farm Fire and Casualty Company (State Farm) insured the Mondragons; it paid, to the Mondragons or on their behalf, the sum of $92,465.01. In exchange for this payment the Mondragons released State Farm and executed a subrogation receipt. The receipt subrogated State Farm to all of the Mondragons' rights and claims against any party, person or corporation liable for the loss covered by the release. The receipt authorized State Farm to sue or settle, in the Mondragons' name, "to the extent of said payment."

State Farm intervened as a party-plaintiff. Its complaint in intervention named Fisher and Cotton as defendants. The problem of computation arises because State Farm settled its portion of the Mondragons' damage claim prior to trial. State Farm was paid $60,500 for the settlement.

The only defendant held liable was Fisher. The jury determined that Fisher's percentage of fault was forty percent. The trial court subtracted State Farm's subrogation amount of $92,465.01 from the Mondragons' total damages of $190,000 and multiplied the remainder by forty percent. It entered judgment against Fisher and in favor of the Mondragons in the amount of $39,013.68.

Fisher's cross-appeal contends the trial court's computation was wrong. Because Fisher was found to be liable for only forty percent of the Mondragons' damage, Fisher asserts that the judgment results in an overpayment to the Mondragons.

How does Fisher support an overpayment? It states the basic question is, "[A]t what point in the computation of the judgment against Fisher was the credit for the settlement to be given"? Fisher would apply its forty percent liability against the $190,000 damages, for a total liability of $76,000. It would subtract from this $76,000, the total amount of the subrogation claim that was settled. The result would be a negative figure. It asks that the trial court be directed to amend the judgment so that the Mondragons recover nothing from Fisher. It asserts that if this is not done the Mondragons' damages are not "discounted" a full sixty percent for the fault attributed to Mondragon and Isabel. Its discount argument credits the Mondragons with the amount of the State Farm subrogation plus the $39,013.68 amount in the judgment and points out that the sum exceeds the $76,000 for which Fisher is liable.

The Mondragons respond with two illustrations. The first illustration accords with the trial court's computation by subtracting the total amount of the subrogation claim from the total damages and applying the forty percent factor to the remainder. The second illustration accepts Fisher's argument that its total liability was $76,000. It points out that the portion of that liability that could have been recovered by State Farm was forty percent of $92,465.01. This amount is $36,986. If the amount is subtracted from $76,000, the remainder is $39,014, which is the amount of the judgment.

Fisher and the Mondragons agree that the settlement of State Farm's subrogation is to be credited and that State Farm's right to recover is dependent upon the Mondragons' right to recover. *See Fireman's Fund American Insurance Companies v. Phillips, Carter, Reister & Associates, Inc.*, 89 N.M. 7, 546 P.2d 72 (Ct.App. 1976). Their dispute is over the proper method of applying that settlement.

█ Our view, expressed in *Wilson v. Galt*, 100 N.M. 227, 668 P.2d 1104 (Ct.App. 1983), is that the portion of the case which was settled was completely disposed of by the settlement without regard to Fisher's liability. The settlement occurred prior to trial. The jury was not informed of State Farm's payment; however, the damages covered by that payment were included in the damage evidence submitted to the jury. Thus, the total damages awarded by the jury included the damages paid by State Farm. Those damages were removed from the suit by the settlement. The trial court properly subtracted the total subrogation claim from the total damages and applied the forty percent factor to the remainder.

Fisher asserts that *Wilson* is distinguishable on its facts. This is correct; the settling party in *Wilson* was out of the case. In *Wilson*, the nonsettling parties sought to take advantage of what turned out to be an overpayment by the settling party. Fisher remained in the case; it settled only the portion of the Mondragons' claim to which State Farm was subrogated. Fisher seeks to take advantage of its settlement by applying its liability factor before considering the settlement. This is inappropriate. What was settled is to be removed from the total damages awarded before the liability factor is applied.

This result is supported by the discussion in *Wilson*.

*Wilson* states: "If the injured person settles and releases one tortfeasor, the consideration paid would satisfy only that tortfeasor's percentage of fault, even though no jury determination of the amount of his liability exists at the time of settlement." 100 N.M. at 232, 668 P.2d 1104. Fisher's settlement satisfied only its percentage of fault for the portion of the Mondragons' damages (the subrogation) which was settled.

*Wilson* states:

[T]he injured person, by settling, would not recover more than his total damages, because each tortfeasor would pay, by settlement or judgment, only his respective share. * * * If the settling tortfeasor paid more in settlement than his apportioned share of the total damages * * * the injured person, without reduc-

tion, would retain the benefit of the contractually made bargain.

100 N.M. at 232, 668 P.2d 1104. Fisher paid more than its apportioned share of damages (the forty percent factor) in settling the subrogation portion of the Mondragons' damage claims. Nevertheless, Fisher settled only its respective share. State Farm, as subrogee of the Mondragons, retains the benefit of the contracted overpayment. The overpayment is not to be used to reduce the unsettled portion of the Mondragons' damages.

As stated in *Wilson:* "Policy considerations favor this approach. It encourages settlements." 100 N.M. at 232, 668 P.2d 1104. There was no error in the computation of the Mondragons' judgment.

 Fisher contends that even if the computation was correct it, nevertheless, is entitled to the benefit of the amount State Farm paid to the Mondragons. "Fisher should be entitled to a credit against any amounts payable to the Mondragons by Fisher to the extent of the payments made to the Mondragons by State Farm ... that is, $92,465.01." This claim is frivolous. State Farm paid the Mondragons pursuant to an insurance contract between those parties. Fisher identifies nothing indicating it was a beneficiary of the contract. The subrogation provisions of the policy and the release and subrogation receipt negate the argument that Fisher was a beneficiary. *Cf. Gantt v. L & G Air Conditioning,* 101 N.M. 208, 680 P.2d 348 (Ct.App. 1983).

The judgment provides that Cotton and Arrow shall recover their costs from Jaramillo and the Mondragons. The judgment also provides that Jaramillo and the Mondragons shall recover their costs from Fisher. In the trial court Fisher contended that it should be liable for only forty percent of plaintiffs' costs. It abandons that position on appeal because of our decisions. *See Robison v. Campbell,* 101 N.M. 393, 683 P.2d 510 (Ct.App.1984); *Eichel v. Goode, Inc.,* 101 N.M. 246, 680 P.2d 627 (Ct.App.1984). Fisher recognizes that the award of costs is in the trial court's discre-

tion; it asserts the trial court failed to exercise its discretion. We disagree.

The judgment of the trial court is affirmed. No appellate costs are awarded; each party shall bear its appellate costs.

IT IS SO ORDERED.

BIVINS and MINZNER, JJ., concur.