805 P.2d 88

**Kathleen M. RHINEHART,**
**Petitioner–Appellee/Cross–Appellant,**

v.

**Bruce C. NOWLIN,**
**Respondent–Appellant/Cross–Appellee.**

**No. 11839.**

Court of Appeals of New Mexico.

Dec. 18, 1990.

Mary E. Lebeck, Cynthia A. Fry, Lebeck & Fry, P.A., Albuquerque, for respondent-appellant/cross-appellee.

William J. Lock, Albuquerque, for petitioner-appellee/cross-appellant.

## OPINION

APODACA, Judge.

The original opinion filed October 25, 1990 is hereby withdrawn, on the court's own motion, and the following opinion is substituted in its place.

Respondent (father) appeals the trial court's judgment granting petitioner's (stepmother) contempt motion, denying father's motion to rescind an order of the trial court stipulated to by the parties (the stipulated order), and sanctioning father for contempt. Stepmother cross appeals the trial court's judgment vacating the stipulated order and denying her request to be awarded physical custody of father's two minor children. Father essentially raises two issues on appeal: (1) whether the trial court, as a matter of law, lacked subject matter jurisdiction to approve, construe, modify, or enforce the stipulated order; and (2) whether the trial court erred in imposing $20,000 in contempt sanctions. On her cross-appeal, stepmother claims the trial court, under its statutory mandate to protect the best interests of the children, abused its discretion in vacating the stipulated order and in not changing custody. Both parties request attorney fees on appeal.

This appeal presents an issue of first impression in New Mexico: whether a stepparent has any right, as a matter of law, to either visitation or custody of his or her spouse's natural children. Because we determine that the custody issue was not properly before the trial court, we only address the visitation issue. We hold that the trial court had subject matter jurisdiction and did not abuse its discretion in imposing sanctions against father. We therefore affirm the trial court's judgment.

HISTORY OF PROCEEDINGS

In May 1987, stepmother filed a petition for divorce against father, following three and one-half years of marriage. A month later, she amended her petition, seeking, among other things, a time-sharing arrangement with respect to father's two minor children from a prior marriage. At that time, the children, Nigel and Joel, were seven and six years of age respectively.

In October 1987, the parties entered into the stipulated order, in which they acknowledged that a dispute existed on the question of whether stepmother had any legal rights regarding the children. In spite of their dispute, however, under the stipulated order, they agreed to visitation between stepmother and the children, provided for mediation or arbitration by a court-appointed psychologist, and recited that "[t]his order ... does not constitute an acknowledgement by [father] of any legal rights [that mother] may have regarding the children." The provisions of this stipulated order were adopted in the parties' marital settlement agreement, which in turn was incorporated into the final decree filed in December 1987.

Beginning in May the next year, the parties filed a series of motions concerning stepmother's visitation privileges. On May 4, stepmother filed a motion for an order to show cause why father should not be held in contempt for violating the visitation provisions of the stipulated order. On May 16, father filed a motion to rescind the stipulated order. The trial court held numerous hearings on these motions. At one point, the court, sua sponte, questioned whether it had subject matter jurisdiction to enforce, rescind, or modify the stipulated order. In a memorandum order dated July 22, however, the court concluded that it did have subject matter jurisdiction to make these determinations.

On June 28, 1989, after additional hearings, the trial court filed extensive findings of fact and conclusions of law. The court entered its final order granting stepmother's motion and request for sanctions and denying father's motion to rescind the stipulated order. The court also held that the visitation provisions in the stipulated order were no longer in the children's best interests and vacated the stipulated order. In connection with the contempt sanctions, the court awarded judgment against father in favor of stepmother in the amount of $26,074.49. Of this amount, $3,000.00 constituted sanctions imposed against father for increased attorneys' fees resulting to stepmother, unreasonable litigation conduct and failure to comply with reasonable discovery. The sum of $3,500.00 sanctioned father for civil contempt of the court's orders ordering father to produce his children for an interview with a court-appointed psychologist and directed that he pay stepmother this amount towards her attorneys' fees. The amount of $16,500.00 was a sanction for father's civil contempt in violating the stipulated order. Finally, $2,074.49 represented legal costs awarded to stepmother.

FACTS

Father and stepmother were married October 22, 1983. At that time, father had custody of the two minor children, subject to visitation rights granted to the children's natural mother (mother). Stepmother be-gan developing a familial relationship with the children when Nigel was approximately three years old and Joel was one and one-half years old. Except for brief separations, she lived with them on a full-time basis during the parties' marriage, until their separation in the spring of 1987. During the marriage between the parties, however, father was the primary parental figure for the children. Since mid–1983, because the children had only limited contact with their mother, stepmother became the major maternal influence in their lives. The relationship between the parties before, during, and after their marriage was characterized by extreme conflict, fighting, chaos, and periods of separation.

Nigel has had a history of adjustment problems in school and psychological difficulties since he attended kindergarten. These problems were primarily attributable to prior child abuse by a stepfather, the abrupt loss of his relationship with his mother, and conflict between his natural parents. While attending kindergarten, Nigel entered therapy with a psychologist, Dr. Christine Nicholson. His primary bonding was with father, but he also developed a positive and important psychological parent-child bond with stepmother. Nigel's treatment with Dr. Nicholson ended in January 1987.

For several months after the parties' separation in the spring of 1987, stepmother visited with the children but not under a formal visitation schedule. The parties then entered into the stipulated order in October 1987. Pursuant to the terms of this order, the parties consulted a psychologist, Dr. Karl Koenig, to discuss and resolve disputes regarding visitation and communication. During this time, however, the children were exposed to many loud and hostile scenes between the parties concerning disagreements over the children. This conduct was found by the trial court to be harmful to the children. In February or March of 1988, Nigel began exhibiting severe emotional distress and many of the same serious behavioral problems he had experienced after separation from his mother. Although both parties contributed to the children's suffering from

exposure to the conflict, the trial court apparently found that father was primarily responsible for the level of the conflict.

In April 1988, father took the children out of school and unilaterally terminated stepmother's physical visitation with the children. The incident giving rise to father's action was as follows: Nigel had been seeing the school counselor for several months, without stepmother's knowledge. One morning, Nigel told stepmother about the counselor. Stepmother insisted on talking to the counselor, who refused to speak to her. During the course of that day, Nigel became extremely anxious and agitated about the prospect of stepmother questioning him further after school about the counseling. For that reason, he was unable to do his school work or behave appropriately in class. As a result, the counselor telephoned father to take Nigel home from school.

After the incident, father made no further attempts to comply with the visitation provisions of the stipulated order. In September, while the proceedings giving rise to this appeal were pending, father unilaterally terminated stepmother's telephone contact with the children. Since then, the emotional condition of Nigel has not returned to normal, and the children have not significantly thrived and improved emotionally.

Even though the trial court found that it would be in the children's best interests to continue visitation with stepmother, it held that, because of the extreme hostility and animosity between the parties, it would not be in the children's best interests to continue court-mandated visitation. Because the trial court believed that father's actions and conduct were unlikely to change in the future, it vacated the stipulated order. Although the trial court held that father did not act in the best interests of the children in preventing contact with stepmother, it nonetheless concluded that father was otherwise a fit if not exemplary parent. The court also denied stepmother's request for a change of custody.

## DISCUSSION

### A. *Jurisdiction*

■ We first address whether the trial court had subject matter jurisdiction to approve, construe, modify, or enforce the parties' stipulated order granting visitation rights to stepmother. We determine that trial courts, in proceedings for dissolution of a marriage, have the power and authority to execute, modify or vacate *any order* involving the guardianship, care, custody, maintenance and education of minor children. *See* NMSA 1978, § 40–4–7(B), (C) (Repl.Pamp.1989). Specifically, trial courts are given exclusive jurisdiction of *all matters* relating to the guardianship, care, custody, maintenance and education of the children. *Id.* We conclude that the granting of visitation rights to a person or persons who the trial court determines are significant and important to the welfare of the children is a part of the trial court's grant of power. We thus hold that the trial court here had subject matter jurisdiction to approve and later enforce or modify the stipulated order.

Father's argument on the jurisdictional issue essentially equates visitation to custody. He claims that visitation is a limited form of custody. *See Perry v. Superior Court of Kern County*, 108 Cal.App.3d 480, 166 Cal.Rptr. 583 (1980); 59 Am.Jur.2d *Parent and Child* § 36 (1987). Father then asserts that the defeat of Senate Bill 488, exempting stepparents in *custody* claims from having to show the natural parents' unfitness, indicates a legislative intent not to allow custody or visitation rights to stepparents.

We first address father's legislative intent argument based on what he perceives to be the pertinent legislative history relevant to this appeal. We note that, other than the compiler's notes contained in our annotated statutes, and an examination of the language of the statute in question, no formal legislative history of record exists declaring legislative intent concerning allowance of child visitation by individuals other than the children's natural parents. In this regard, we agree with stepmother's argument that use of committee reports as

a guide in judicially determining legislative intent depends solely on the development of the standing committee report as something more than a mere recommendation. 2A N. Singer, *Sutherland Statutory Construction* § 48.06 (4th ed. rev. 1984). The authorities relied on by father do not support his interpretation of legislative history based on legislative committee actions in states without recorded legislative history. Points on appeal not supported by authority will not be reviewed. *See* SCRA 1986, 12–213; *Wilson v. Albuquerque Bd. of Realtors,* 81 N.M. 657, 472 P.2d 371 (1970), *overruled on other grounds, Garrett v. Nissen Corp.,* 84 N.M. 16, 498 P.2d 1359 (1972). We therefore decline to review father's legislative history argument.

Instead, we follow New Mexico's well-established principles for statutory construction. In construing a statute, the court must give effect to the intention of the legislature. *Smith Mach. Corp. v. Hesston, Inc.,* 102 N.M. 245, 694 P.2d 501 (1985). In determining intent, we look primarily to the language used, yet may also consider the history and background of the subject statute. *First Nat'l Bank of Santa Fe v. Southwest Yacht & Marine Supply Corp.,* 101 N.M. 431, 684 P.2d 517 (1984). Legislative history in New Mexico, however, has involved analysis of previous enacted statutes relating to the same subject matter or amendments to the disputed statute, *see id.; Smith Machinery Corp. v. Hesston, Inc.,* not passage or defeat of legislative proposals at the committee level.

Additionally, all statutes in para materia must be read together to ascertain legislative intent. *Quintana v. New Mexico Dep't of Corrections,* 100 N.M. 224, 668 P.2d 1101 (1983); *Grudzina v. New Mexico Youth Diagnostic & Dev. Center,* 104 N.M. 576, 725 P.2d 255 (Ct.App.1986). The construction adopted may not render the statute's application absurd, unreasonable or unjust. *City of Las Cruces v. Garcia,* 102 N.M. 25, 690 P.2d 1019 (1984). Appellate courts must give the words used in the statute their ordinary meaning unless the legislature indicates a different intent. *See Rutledge v. Fort,* 104 N.M. 7, 715 P.2d 455 (1986); *State v. Rodriguez,* 101 N.M. 192, 679 P.2d 1290 (Ct.App.1984).

Applying these review principles to this appeal, it is clear that the legislature did not equate custody and visitation rights. We believe the pertinent statutes, taken together, reflect the legislature's intent to grant trial courts wide discretion in awarding either custody or visitation based on the best interests of the children, subject to parental preference doctrine in *custody* matters only. *See* NMSA 1978, § 40–4–9.1(K) (Repl.Pamp.1989); *see also* NMSA 1978, §§ 40–4–7 to –9.1 (Repl.Pamp. 1989); NMSA 1978, § 40–9–1 (Repl.Pamp. 1989).

We also disagree with father's contention that visitation is a limited form of custody. NMSA 1978, Section 40–10–3(B) (Repl.Pamp.1985) differentiates custody and visitation by including visitation rights *within* custody determinations. An award of custody involves more than designated time periods to be shared with minor children. A custody award confers the person with significant legal rights, privileges, duties, and obligations. *See* § 40–4–9.1. Besides a well-defined time-sharing arrangement, legal custody includes responsibility for the child's financial, physical, emotional, and developmental needs. *See id.* Custody grants a person the legal right to make decisions regarding the child's religion, education, child care, recreational activities, and medical and dental care. *Id.* It would be unreasonable to conclude, as father urges this court to do, that the legislature, in drafting and enacting Section 40–9–1, intended only to grant grandparents the above-noted custodial rights and obligations, in giving trial courts discretion to award reasonable visitation privileges to grandparents.

Recently, in *Brito v. Brito,* 110 N.M. 276, 794 P.2d 1205 (Ct.App.1990), this court dealt with the meaning of "custody" under Section 40–4–9.1(L)(2). Even though *Brito* involved a dispute between the rights of natural parents and third parties, this court differentiated physical custody in the father and visitation in the mother. In *Brito,* the trial court had granted joint legal cus-

tody to both parents, with the father having physical custody of the child and mother having liberal visitation rights. Although the father had physical custody, because of his employment in Santa Fe, the child resided with an aunt and uncle in Taos. Father spent three to four days a week with the child. Based on the joint legal custody award, the mother was to be consulted in all major decisions concerning the child.

In determining the effect, if any, of "constructive custody" in the aunt and uncle, *Brito* concluded that "custody" involved more than physical care. *Id.* It required *control* over the decisions in the child's life. *Id.*, 110 N.M. at 279, 794 P.2d at 1208 (citing *Porch v. Porch*, 327 Pa.Super. 346, 475 A.2d 831 (1984)) (grandparents did not have custody of minor children even though the children resided with them, because the father who had *custody* had not surrendered *control*).

Under the "best interests of the children" standard, we believe courts have wide latitude to consider *all relevant* factors affecting the welfare of minor children. One of the factors the court must consider is the interaction and interrelationship of the children with parents, siblings and *any other* person who may significantly affect the children's best interests. § 40–4–9(A)(3). *See Normand By and Through Normand v. Ray*, 109 N.M. 403, 785 P.2d 743 (1990); *see also Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977). In *Spells*, the court observed:

> Whether a stepfather should be permitted to visit his stepchild who is in the custody of the mother has not been considered extensively. In *Commonwealth v. Rozanski*, 206 Pa.Super. 397, 400, 402, 213 A.2d 155 (1965), our Court addressed the issue of awarding visiting privileges to the putative father when his illegitimate child is in the custody of the mother. We stated: "[I]n any case involving visitation, neither the fact of illegitimacy nor the personal preferences or prejudices of the parents should control our decision. *The governing criterion must always be the welfare and best interest of the child".*

*Id.* 250 Pa.Super. at 174, 378 A.2d at 882 ·(emphasis in original).

We also observe that, under the doctrine of parens patriae, New Mexico courts have inherent powers to act in the best interests of the children. *Bassett v. Bassett*, 56 N.M. 739, 250 P.2d 487 (1952). The courts have consistently recognized that the state is parens patriae and the child's welfare and best interests are the paramount consideration for the court in custody cases. *Id.* at 751, 250 P.2d at 494; *see also Garcia v. Garcia*, 81 N.M. 277, 466 P.2d 554 (1970); *Ettinger v. Ettinger*, 72 N.M. 300, 383 P.2d 261 (1963).

To carry out this mandate, the legislature has vested the district courts with wide discretion in determining custody and designing parenting plans, including visitation arrangements. *See* §§ 40–4–9 to –9.1. The only limitation on the court's discretion for determining *custody* is Section 40–4–9.-1(K). Before the court can award *any person* other than a natural or adoptive parent custody of the children, the court must show unfitness in the natural or adoptive parent. *Id.* This requirement, however, is not relevant to a determination of visitation. *See* § 40–9–1 (a finding of unfitness not required to grant reasonable visitation privileges to grandparents).

We thus reject father's argument that the legislature's failure to permit statutorily the granting of visitation rights to stepparents necessarily prohibited the trial court from exercising jurisdiction for that purpose in this appeal. We conclude that the absence of legislative expression on the subject did not affect a trial court's wide latitude in matters involving the best interests of minor children. We hold that the trial court had the power and discretion to grant visitation rights to stepmother, where visitation is in the best interests and welfare of the children.

### B. *Contempt Sanctions*

Father next takes issue with the trial court's imposition of contempt sanctions. Of the total award of $26,074.49, father does not challenge: (1) $2,000 for unreason-

able litigation conduct; (2) $1,000 for discovery sanction; and (3) $3,074.49 for costs, including expert witness fees. Nonetheless, father challenges the trial court's award of the following amounts to stepmother: $16,500 toward stepmother's attorneys fees as sanction for father's civil contempt; $3,500 toward stepmother's attorneys fees as an additional civil contempt sanction for violating the court's orders of July 20 and 21, 1988. Father contends the trial court erred in awarding the additional $20,000 sanction because: (1) the contempt was criminal in purpose and nature and the court failed to provide the required procedural due process; and (2) if the sanctions were for civil contempt, the trial court abused its discretion since there was no substantial evidence to support a finding of civil contempt and to support the allocation of fees.

### 1. The Contempt—Civil or Criminal?

■ We decline to adopt father's characterization of the contempt proceedings as criminal in purpose and nature. Instead, we conclude that the sanctions were civil in nature, as characterized by the trial court. When the purpose of the sanction is punitive, the proceeding is one of criminal contempt, and the sanction is paid to the court. *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). *See also In re Klecan*, 93 N.M. 637, 603 P.2d 1094 (1979). On the other hand, contempt is civil if the relief provided in a contempt proceeding is remedial and is paid to the complainant. *Hicks on Behalf of Feiock v. Feiock; In re Hooker*, 94 N.M. 798, 617 P.2d 1313 (1980); *Costilla Land & Investment Co. v. Allen*, 15 N.M. 528, 110 P. 847 (1910). In a civil contempt proceeding, the court has the power to coerce or force compliance with a court order, or in the alternative, the court can impose sanctions by way of compensating the aggrieved party and awarding that party his or her attorney fees and costs. *In re Hooker*, 94 N.M. 798, 617 P.2d 1313 (1980). Awarding compensatory sanctions is only available if petitioner wins the action in the original suit. Fink, *Basic Issues in Civil Contempt*, 8 N.M.L.Rev. 55 (1977–78). We

hold that the nature and purpose of the sanctions were compensatory and that stepmother was the prevailing party.

■ The present sanction was not imposed to punish father or to preserve the authority of the trial court. *State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 315 P.2d 223 (1957). The trial court expressly stated that the sanctions were not imposed to coerce compliance with the stipulated order. However, the court did indicate that it was imposing sanctions to compensate stepmother, as the aggrieved party, one of the purposes for civil contempt. The trial court determined that it would not be in the children's best interests to continue enforcement of court-mandated visitation. The court nevertheless concluded that stepmother should be compensated for legal fees and costs incurred because of father's unreasonable contempt of not only the stipulated order but of later orders. The award clearly compensated stepmother for legal costs incurred due to father's unreasonable and unilateral conduct. Because we determine the sanction was purely compensatory, father was not entitled to the procedural safeguards essential to criminal contempt proceedings.

■ Having concluded that the contempt was civil in nature, we next determine the sufficiency of the evidence to support the finding of contempt and the fee allocation. The rule in New Mexico establishing the elements necessary for a finding of civil contempt is well recognized. To hold a party in civil contempt, there must be evidence of: (1) knowledge of the court's order; (2) ability to comply; and (3) willful noncompliance with the order. *Dial v. Dial*, 103 N.M. 133, 703 P.2d 910 (Ct. App.1985). We will discuss separately the evidence for a finding of contempt with respect to the separate orders: (1) the stipulated order; and (2) the July 20 and 21, 1988 orders. Based on the discussion that follows, we determine that there was sufficient evidence in the record to support a finding of contempt for violation of these orders.

## 2. The Stipulated Order

The record supports a finding that father knew of the time-sharing agreement in the stipulated order and of the procedure agreed upon by the parties for its modification. Represented by trial counsel at the time, father agreed to the stipulated order, which was incorporated in the marital settlement approved in the trial court's final decree. Testimony at trial revealed that father had been preparing to either mediate or litigate alterations to the visitation arrangement spelled out in the stipulated order. The trial court could find father had knowledge of the stipulated order.

With respect to father's ability to comply with the order, we conclude there was sufficient evidence in the record to support such a finding. Until April 15, 1988, father apparently complied with the stipulated order without difficulty. Stepmother had shared significant periods of time with the children under the order. There was evidence that the parties had worked with Dr. Koenig, as mediator, to resolve conflicts and controversies revolving around the visitation arrangement. Father had been complying with the stipulated order, and the trial court implicitly found he had the ability to comply with the order. Father also could have complied with the court-mandated procedures to either modify or vacate the stipulated order.

Instead, he willfully refused to comply with the order. In April 1988, father unilaterally terminated stepmother's visitation as spelled out in the order. If he believed the order was unworkable or harmful to the children, father could have either pursued modification with Dr. Koenig or initiated court proceedings seeking modification or vacation of the order. After father's unilateral termination of visitation, the record indicates the trial court found he only made a half-hearted effort to meet with Dr. Koenig. The trial court could properly conclude that his noncompliance forced stepmother to resort to legal remedies to enforce the order. There was sufficient evidence of willful noncompliance.

We conclude that the trial court was entitled to find that all three requirements for contempt of the stipulated order were met. We thus hold that the trial court did not abuse its discretion in awarding stepmother compensatory legal fees and costs incurred as a direct result of father's civil contempt of the stipulated order.

## 3. The July Orders

As a result of father's noncompliance with the stipulated order, the trial court held numerous hearings on stepmother's contempt motion and father's motion to rescind the order. After a hearing on July 14, 1988, the court rescheduled a hearing for July 25, for the purposes of completing testimony and obtaining a current evaluation of the children. Father was represented by counsel, who did not object to Dr. Koenig's appointment to interview the children. At that time, father's counsel was aware that the interview with the children was to take place before the July 25 hearing.

On July 18, Dr. Koenig scheduled a tentative interview appointment for July 20. Father was asked to check with counsel by telephone concerning the interview. He failed to do so. Instead, on July 19, father's counsel delivered a letter to the trial court, objecting to the proposed order and to Dr. Koenig's interview. To address father's objection, the trial court held an expedited hearing. Immediately after this hearing, the court entered the July 20 order authorizing Dr. Koenig to interview the children. On July 21, the court entered a supplemental order setting the specific interview time for 11:00 a.m. on Friday, July 22. Counsel tried to reach father but was unsuccessful; father had left the state on July 21 for a business trip to Colorado. The trial court adopted a finding of fact that "[b]efore [father] left with the children on July 21, 1988 * * * he was aware that a continued hearing had been set on the order to show cause and other motions for Monday, July 25, 1988; that Dr. Koenig was attempting to set up an interview with the children in connection with this hearing; that a proposed order for an evaluation of the children by Dr. Koenig had been submitted to the court, and that the court

had on July 14, 1988, suggested such interviews. His attorney had left two messages on his answering machine for him to call." The court also found the father's "conduct in making the children unavailable in July, 1988, was willful."

As a result, the July 25 hearing was cancelled. New hearings were set for September 14 and December 21, 1988. Father, as shown by his August motion to set the terms for Dr. Koenig's interview of the children, was well aware of his continuing obligation to comply with the orders of July 20 and 21. Yet, he failed to arrange the court-mandated appointments. Based on these facts, we conclude that father had actual knowledge of the July orders, had the ability to comply, and yet willfully refused to do so. The record reflects he took no action whatsoever in that regard.

These facts clearly support the trial court's finding that father was aware of the court-mandated interview with Dr. Koenig and of his continuing obligation to comply with the orders. Findings of fact that are supported by substantial evidence will not be disturbed on appeal. *See Tome Land & Improvement Co. v. Silva*, 83 N.M. 549, 494 P.2d 962 (1972). If the evidence shows that the trial court's decision is based on relevant evidence as a reasonable mind might accept as adequate, the trial court's decision should be affirmed. *Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 89, 428 P.2d 625, 628 (1967).

▪ Even if we determined that father did not have actual knowledge of the July orders, we believe he had constructive knowledge. Whatever puts a party upon inquiry is sufficient "notice" and the party has a duty to inquire or he will be chargeable with all the facts. *See Johnson v. Ryan*, 43 N.M. 127, 86 P.2d 1040 (1939). In *Taylor v. Hanchett Oil Co.*, 37 N.M. 606, 609, 27 P.2d 59, 60 (1933), the court held that "*knowledge* does not necessarily mean '*actual* knowledge.'" (Emphasis added.) Knowledge of circumstances that would lead a prudent man ordinarily to reasonable investigation of the actual facts is the equivalent of "constructive notice." *Id.*

### 4. Prevailing Party Requirement

▪ Father argues that, even if the sanctions were for civil contempt, stepmother is not entitled to compensation, since she did not prevail on the merits in the original suit. *See* Fink, *supra* at 55. We disagree. Although the trial court felt compelled to vacate that portion of the stipulated order mandating visitation, because of the damaging effect the parties' continuing conflict was having on the children, this court action was not precipitated by, or related to, the question of father's noncompliance. Stepmother was clearly the prevailing party. Father failed in his motion to rescind the stipulated order. Stepmother prevailed on her motions to show cause, to hold father in contempt, and for attorney fees and costs. Judgment was entered against father for $26,074.49. Even though stepmother did not succeed eventually in her further claims for visitation or custody, a party does not have to prevail on all the issues to be a "prevailing party" for an award of attorney fees. *Malvo v. J.C. Penney Co.*, 512 P.2d 575 (Alaska 1973).

### 5. Allocation of Fees

We do not reach father's argument that the allocation of attorney fees was improper. Father cites *In re Hooker* for the proposition that an award of attorney fees to a party aggreived by contempt is limited to the amount incurred in investigating and prosecuting the contempt. However, we determine that father waived this argument on appeal, since it was not raised below or in his docketing statement. *Romero v. Romero*, 101 N.M. 345, 682 P.2d 201 (Ct.App.1984). Father contends that an attack on the allocation of attorney fees was implicit in his attempts in the trial court to defend against the contempt sanction, citing *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274 (Alaska 1985). He does not explain, however, how contentions regarding allocation of fees was implicit in any of his presentations or arguments in the trial court.

## C. *Stepparents' Legal Rights to Either Custody or Visitation*

In her cross-appeal, stepmother argues that the trial court erred in failing to continue the visitation privileges under the stipulated order or to grant her custody based on the statutory mandate of the best interests of the child. §§ 40–4–7, –9. For the reasons that follow, we conclude that the trial court did not abuse its discretion in either vacating the provisions of the stipulated order or in dismissing stepmother's request for custody.

### 1. Change of Custody

 With respect to the custody issue, we agree with the trial court that the issue was not properly before the court. Stepmother did not request an award of physical custody in any of her previous motions. Although there was evidence introduced without objection at trial that may have been relevant to a theory of change of custody, the same evidence was also relevant to the visitation and contempt issues that were being litigated by the parties. When the evidence introduced is relevant to some other issue and the parties do not squarely recognize it as an issue in the trial, consent to try that issue cannot be implied. *Rice v. Gideon*, 86 N.M. 560, 525 P.2d 920 (Ct.App.1974); 3 J. Moore, *Moore's Federal Practice,* ¶ 15.13 (1989). The court itself concluded that the issue was not tried with either the express or implied consent of the parties.

Likewise, we believe the trial court correctly concluded that the children's mother was an indispensable party to a determination of the children's custody. The mother's parental rights had never been terminated. In fact, the mother had been granted visitation rights that could be substantially affected by a change of custody to stepmother. Parties, subject to service, *shall* be joined if they claim an interest relating to the subject of the action and are so situated that the disposition of the action in their absence may, as a practical matter, impair or impede their ability to protect that interest. SCRA 1986, 1–019. We conclude that the children's mother was an indispensable party in any action determining custody of her children and that the trial court did not err in dismissing stepmother's claim for a change of custody. As a result of our holding, we need not reach the issue of whether stepparents standing in loco parentis may be awarded custody of the spouse's natural children.

### 2. Continuation of Visitation

 We disagree with stepmother's argument that the trial court abused its discretion in refusing to continue the visitation provisions of the stipulated order in force. We determine that there was sufficient evidence in the record to support the court's decision that *court-mandated* visitation, in view of the continuing conflict between the parties, would not be in the best interests of the children. *See Edington v. Edington*, 50 N.M. 349, 176 P.2d 915 (1947) (the welfare of the child is the matter of primary concern, paramount to the wishes of parents). We disagree with stepmother's contention that termination of visitation was contrary to the trial court's finding that it was in the children's best interests to continue their visitation with stepmother, in light of the parties' dispute.

Ideally, had the parties been capable of controlling their animosity and hostility toward one another, we would agree that the trial court may well have found that continuing stepmother's visitation would have been in the children's best interests. However, the record is replete with evidence of many loud and angry confrontations between the parties regarding visitation. There was expert testimony adduced that exposure to such intense conflict was placing the children, especially Nigel, under intolerable stress. Nigel's behavior at school had begun to deteriorate significantly. Dr. Koenig, the psychologist, testified that the severe harmful impact on the children was not only due to the parties' conflict, but mostly to the fact that the parties inevitably would draw the children into the conflict. He also stated that, if the parents could not change their pattern of hostility, it would not be in the best interests of the

children to continue court-mandated visitation.

We determined previously that the trial court had jurisdiction to modify or change any order with respect to the guardianship, care, custody, maintenance, or education of the children whenever circumstances rendered such change proper and just. § 40–4–7. Trial courts are vested with broad discretion and great flexibility in fashioning custody arrangements and parenting plans that will serve *the best interests of the children. See Newhouse v. Chavez*, 108 N.M. 319, 772 P.2d 353 (Ct. App.1988). An abuse of discretion occurs when the trial court's ruling is clearly against logic and the effect of facts and circumstances. *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 698 P.2d 887 (Ct. App.1985).

There was credible evidence presented in this case that the court-mandated visitation was extremely detrimental to the children. Under a substantial evidence standard, we view the evidence in the light most favorable to the result below, resolving all conflict and indulging in all inferences in favor of the decision. *Clovis Nat'l Bank v. Harmon*, 102 N.M. 166, 692 P.2d 1315 (1984). We therefore hold that there was sufficient evidence supporting the trial court's decision to modify the stipulated order by vacating the visitation provisions. We conclude that the trial court did not abuse its discretion in vacating the visitation provisions of the stipulated order.

### D. *Attorney Fees*

 Both parties seek an award of attorney fees respectively incurred in this appeal. New Mexico law permits the award of attorney fees on appeal in domestic relation cases. § 40–4–7(A); *see Miller v. Miller*, 96 N.M. 497, 632 P.2d 732 (1981) (holding that Section 40–4–7(A), allowing for expenses of proceedings, is applicable to costs and fees on appeal). Various factors are considered by courts in determining the appropriateness of awarding attorney fees, such as the relative success or frivolity of an appeal. *See e.g. Lewis v. Lewis*, 106 N.M. 105, 739 P.2d 974 (Ct.App.

1987); *Blake v. Blake*, 102 N.M. 354, 695 P.2d 838 (Ct.App.1985). This case involved several significant issues, and petitioner has prevailed in connection with respondent's appeal on the contempt citation, as well as on the award of attorney fees below. We thus hold that an award of $2,500.00 in attorney fees to petitioner is warranted on appeal.

CONCLUSION

In summary, we hold that (1) the trial court did not lack subject matter jurisdiction to approve and enforce the stipulated order; (2) substantial evidence supported the imposition of contempt sanctions; (3) the trial court did not abuse its discretion in vacating the stipulated order; and (4) the trial court did not err in refusing to consider mother's claim for change of custody. The parties shall each bear their own costs, in this appeal. Plaintiff is awarded $2,500.00 in attorney fees.

IT IS SO ORDERED.

DONNELLY, J., concurs.

HARTZ, J., concurs in part and dissents in part.

HARTZ, Judge (concurring in part and dissenting in part).

I concur in the result, except that I would reverse the ruling that father was in contempt of the district court's order of July 21, 1988, and I would remand for further findings and conclusions with respect to the alleged contempt of the order of July 20. For the reasons stated below, I cannot join in much of the majority's opinion.

### I. CONTEMPT OF THE STIPULATED ORDER

#### A. Grounds Upon Which Stepmother Could be Awarded Visitation Rights

My chief concern is the majority's view that a district court may award visitation rights to any person so long as visitation is in the best interests of the child. That may be desirable policy, but it is not the policy adopted by the New Mexico Legislature.

As explained below, the legislature has provided that the best interests of the child give way to the rights of fit natural and adoptive parents in matters of custody. That same subordination of the child's interests also generally prevails with respect to visitation. Although the legislature has recognized that visitation may be awarded to certain categories of persons other than natural or adoptive parents—in particular, grandparents and, more pertinent to this case, those who stand in loco parentis—we should not suggest that the best interests of the child is the only consideration in matters of visitation.

With respect to custodial rights, New Mexico has adopted a strict parental-preference doctrine. NMSA 1978, § 40–4–9.1(K) (Repl.Pamp.1989) states: "When any person other than a natural or adoptive parent seeks custody of a child, no such person shall be awarded custody absent a showing of unfitness of the natural or adoptive parent." This 1981 legislation gives greater priority to parents than earlier judicial decisions, which adopted "a presumption that the welfare and best interests of the minor child will best be served in the custody of the natural parents and casts the burden of proving the contrary on the non-parent." *Shorty v. Scott*, 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975).

The statute expresses a policy that a fit parent's custodial rights are paramount to the child's best interests. Even if the parent were to concede that a child would be better off with another family, the parent who treasures the companionship of the child is still entitled to retain custody. *Compare Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (natural parents have a fundamental liberty interest in the care, custody, and management of their children) *with* Note, *Alternatives to "Parental Rights" in Child Custody Disputes Involving Third Parties*, 73 Yale L.J. 151 (1963) (criticizing parental-rights doctrine as contrary to child's interests).

The majority finds Section 40–4–9.1(K) unpersuasive in the visitation context, pointing out that custody and visitation are not equivalent. Yet if parental rights are dispositive in custody matters, surely they do not become irrelevant when visitation is at stake. If the legislature has spoken on a matter of public policy, the judiciary should respect that policy in matters of statutory interpretation and common-law jurisprudence. *See* Schaefer, *Precedent and Policy*, 34 U.Chi.L.Rev. 3, 18–22 (1966); M. Eisenberg, *The Nature of the Common Law*, 29–30 (1988).

The right of custody is composed of a bundle of subsidiary rights, such as the power to make decisions regarding the child's residence, education, and religion. *See* § 40–4–9.1(L)(2). The most precious of these parental rights is the right to the care and companionship of the child. Few fit parents would trade the right to enjoy a child's company for the power to determine the child's education or medical care.

If a court cannot deny a fit parent custody in favor of a non-parent, a court cannot deny a fit parent the most precious custodial right—the right to the care and companionship of the child—in favor of a non-parent. Although an award of visitation rights to a third person does not constitute a total denial of the custodial parent's right to care and companionship, such an award substantially diminishes that right. Therefore, the law governing visitation rights must take into account the parental preference expressed by the legislature in Section 40–4–9.1(K). In the absence of a contrary expression of policy by the legislature, I would conclude that the parental rights of fit parents prevail over the best interests of the child in matters of non-parent visitation as well as non-parent custody.

There are, however, contrary expressions of policy in two statutes. First, the legislature has adopted specific provisions relating to visitation by grandparents. *See* NMSA 1978, §§ 40–9–1 to –4 (Repl.Pamp. 1989). This statute explicitly provides for visitation by grandparents even without a showing that the parents are unfit. One might infer that the statute expresses a public policy in favor of awarding visitation rights to non-parents so long as it is in the best interests of the child. One could also

infer, however, that the legislature enacted the grandparent-visitation statute because it assumed that in the absence of the statute grandparents could not be awarded visitation rights—in other words, the award of visitation rights to non-parents (when the parents are fit) is permissible only when specifically authorized by statute. Both inferences read too much into the enactment of the grandparent-visitation statute. An intermediate interpretation is more plausible: Although enactment of the grandparent-visitation statute suggests that the legislature regards an award of visitation rights to a third person as a substantially lesser infringement of parental rights than a denial of custody, the enactment also suggests that such an infringement requires some sort of legislative imprimatur (not necessarily explicit statutory authorization).

The second statute more closely relates to this case. Section 40–4–9.1(L)(8) defines "visitation" as "a period of time available to a noncustodial parent, under a sole custody arrangement, during which a child resides with or is under the care and control of the noncustodial parent." *Cf.* NMSA 1978, § 40–4–11.1(D)(2) (Repl.Pamp. 1989) (defining "basic visitation" for purposes of child support). "Parent" is defined as "a natural parent, adoptive parent or person who is acting as a parent who has or shares legal custody of a child or who claims a right to have or share legal custody[.]" § 40–4–9.1(L)(4). These definitions prompt two observations. First, visitation by non-parents is not recognized in the definition of "visitation." Authority for such visitation must be found elsewhere, as in the grandparent-visitation statute. Second, even though natural and adoptive parents have an absolute preference with respect to custody, *see* § 40–4–9.1(K), other types of "parents" may be awarded visitation rights. To be sure, Section 40–4–9.1(L)(8) is only a definition and does not purport to establish substantive law (indeed, the purpose of the definition is unclear, because the word "vis-

itation" does not appear elsewhere in Section 40–4–9.1). Nevertheless, the definition's recognition of visitation by parents who are neither natural nor adoptive parents is a sufficient imprimatur to conclude that such visitation does not violate legislative policy.

Despite the obscurity of the statutory definition of "parent," I feel comfortable that it includes at least those persons who stand in loco parentis with a child. Thus, if stepmother held that status with respect to the children, an award of visitation rights was lawful.

I agree with the majority that we cannot draw any contrary inference from the legislature's failure to pass a bill introduced in 1987 that would have provided various persons, including stepparents, with rights to custody. There are too many other reasons why a bill does not become a law for us to infer that failure to enact a bill means legislative rejection of every substantive provision of the bill.[1]

B. Jurisdiction to Enter the Stipulated Order

Father contests the jurisdiction of the district court to enter the stipulated order. Given the authority of the district court to award visitation rights to one who stands in loco parentis, father's argument reduces to the claim that stepmother did not have an in loco parentis relationship with the children and therefore the district court did not have jurisdiction to award her visitation rights. Conceding that he stipulated to the order, father relies on the proposition that subject-matter jurisdiction cannot be conferred by consent of the parties. *See Zarges v. Zarges*, 79 N.M. 494, 445 P.2d 97 (1968); *Elwess v. Elwess*, 73 N.M. 400, 389 P.2d 7 (1964).

The existence of an in loco parentis relationship was not, however, necessary to confer jurisdiction on the district court. Just because the proper issuance of an order requires the existence of a particular

1. Also, the Child Custody Jurisdiction Act, NMSA 1978, §§ 40–10–1 to –24 (Repl.Pamp. 1989), is irrelevant to the question here, because it does not affect substantive rights and its definitions are designed to encompass statutory schemes in other states.

fact does not mean that the existence of the fact is necessary for the court to have jurisdiction. *See Sundance Mechanical & Util. Corp. v. Atlas,* 109 N.M. 683, 687, 789 P.2d 1250, 1254 (1990) (jurisdiction to hear a claim does not depend on validity of the claim). Although the meaning of "jurisdiction" may vary with the context, *see id.* at 690, 789 P.2d at 1257 (sometimes an error is labelled "jurisdictional" to mean that it may be raised for the first time on appeal); *Restatement (Second) of Judgments,* § 11 comment e (1982), it has a settled meaning in New Mexico when the district court's jurisdiction to enter an order is challenged in a contempt proceeding. *State v. Patten,* 41 N.M. 395, 69 P.2d 931 (1937) held in that context that "[t]he test of the jurisdiction of a court is whether or not it had *power to enter upon the inquiry;* not whether its conclusion in the course of it was right or wrong." *Id.* at 399, 69 P.2d at 933 (emphasis in original). By that standard the district court undoubtedly had jurisdiction to enter the stipulated order.

## C. Ultimate Success of Father

Father also contends that he cannot be held in civil contempt of the stipulated order because "this sanction [civil contempt to compensate for losses due to contemptuous conduct] is available only if petitioner wins his action in the original suit on the merits." Fink, *Basic Issues in Civil Contempt,* 8 N.M.L.Rev. 55, 71 n. 62 (1977–78). Unfortunately, the article cites no case law in support of the proposition, so its scope is unclear. The proposition makes sense if it means merely that remedial relief is unavailable if the order violated is later found to have been invalid. *See United states v. United Mine 'Workers,* 330 U.S. 258, 294–95, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947) (right to remedial relief falls with an injunction which events prove was erroneously issued). I see no reason, however, to apply it to relieve a party of contempt sanctions solely because an order was later modified as a result of changed circumstances. Father's stipulation to the order constituted a stipulation (at least for the purposes of that order) to all facts necessary to issuance of the order. He has no

right to challenge at this late date the factual basis of the stipulated order. He should not be relieved from paying for damage caused by his violation of the stipulated order on the ground that the order was later modified prospectively because of subsequent events.

### D. Nature of Contempt Sanction and Violation of the Order

I concur in the majority's opinion that the contempt sanction was civil and that the district court could properly find that father was in contempt of the stipulated order.

## II. CONTEMPT OF THE JULY ORDERS

I dissent from the majority's affirmance of the comtempt penalty for violation of the orders of July 20 and 21. The district court apparently found father in contempt of orders of whose existence he had no actual knowledge.

*Dial v. Dial,* 103 N.M. 133, 136, 703 P.2d 910, 913 (Ct.App.1985) included "knowledge of the court's order" among the elements necessary for a finding of civil contempt. *Accord In re Hooker,* 94 N.M. 798, 617 P.2d 1313 (1980). The knowledge need not be of the specific terms of the order, so long as the party has knowledge of the existence of the order. *See General Motors Corp. v. Gibson Chem. & Oil Corp.,* 627 F.Supp. 678, 681–82 (E.D.N.Y.1986).

The district court did not find that father knew of the July 21 order before the time for compliance or that father knew of the July 20 order for at least several days after its issuance. The facts are as follows:

The district court held hearings on May 31 and July 14, 1988, on father's alleged contempt of the stipulated order and on father's motion to rescind the stipulated order. At the conclusion of the July 14 hearing the district court scheduled a continuation of the hearing for Monday, July 25, and suggested that Dr. Koenig should conduct a current-status interview with the children. Father's counsel voiced no objection to the suggestion. According to the district court's Finding No. 61, "It was

resolved that [Dr. Koenig] should be requested to conduct this interview so he could report to the Court at the July 25, 1988 hearing."

On July 15 stepmother's attorney submitted to the district court, with a copy to father's attorney, a proposed order appointing Dr. Koenig as an expert to provide an evaluation to the court concerning visitation arrangements with the children, authorizing Dr. Koenig to conduct the evaluation in a manner he deemed appropriate, and ordering the parties "to cooperate with Dr. Koenig's evaluation and carry out his directives incident thereto." The only time constraint expressed in the proposed order was in paragraph E, which read:

If possible, Dr. Koenig should provide his evaluation and recommendations in a written report and distribute it to counsel for both parties prior to the hearing on the merits herein. If there is insufficient time to provide a written report prior to the hearing, the report shall be provided at trial.

In a letter accompanying the proposed order, stepmother's attorney advised the district court that Dr. Koenig had agreed to see the children and requested that time be shortened for father's attorney to object to the form of order or present his own, in view of the contemplated July 25 hearing date. On July 19 father's attorney delivered to the court a letter objecting to the proposed order, to any further evaluation of the children, and to Dr. Koenig's continued involvement in the case. The letter also requested a hearing on the matter.

The district court conducted a hearing on July 20 and immediately entered an order based on the proposed order submitted by stepmother's attorney. The order required the parties "to cooperate with Dr. Koenig's interviews and carry out his directives," but it eliminated paragraph E of the proposed order and made no mention of any time constraint.

The afternoon of the following day, July 21, the district court entered a supplemental order requiring father to bring the children to an appointment with Dr. Koenig at 11:00 a.m. on Friday, July 22.

Father was not present at the July 20 hearing. Father's attorney advised the district court on July 22 that he had not been able to inform father of the court's order for the July 22 interview. On July 18 Dr. Koenig's office had made a tentative appointment with father and the children for July 20; father was to check with his attorney and call back, but did not do so. On July 21 father left with his children for Aspen, Colorado, where father had been previously scheduled to show some of his art work.

The district court found that when father left for Aspen,

he was aware that a continued hearing had been set on the Order to Show Cause and other motions for Monday, July 25, 1988; that Dr. Koenig was attempting to set up an interview with the children in connection with this hearing; that a proposed order for an evaluation of the children by Dr. Koenig had been submitted to the Court, and that the Court itself had on July 14, 1988, suggested such interviews. His attorney had left two messages on his answering machine for him to call.

As I understand the district court's ruling, it imposed the civil contempt sanction, at least in part, because of father's failure to comply with the July orders prior to the scheduled July 25 hearing, even though father had no actual knowledge before July 25 that either order had been entered. The district court made no finding of such actual knowledge. Therefore, the contempt sanction for violation of the July orders cannot stand.

A finding of contempt should not be based on a party's knowledge that the court has expressed a favorable view toward entering an order at a future date. Too many things can cause the court to change its mind. With respect to the July 20 order, even assuming that father knew of the terms of the proposed order, his attorney had objected to the proposed order and requested a hearing to argue against it. We should not presume that father knew that the judge would enter the order after hearing the objections of father's at-

torney. Indeed, the order actually entered on July 20 differs from the proposed order in that it contains no mention of a time deadline. It is questionable whether failure to comply by July 25 with the July 20 order would have constituted contempt of the order, particularly given father's travel plans; that is probably why the July 21 order was entered. As for the July 21 order, there was no finding by the district court (and apparently no evidence) that father knew that an order had been or would be entered requiring him to bring the children for an interview on July 22.

The majority suggests that the only knowledge required of one held in contempt is *constructive* knowledge of the order violated. Yet the only support the majority finds for its view are two New Mexico quiet-title cases that discuss constructive knowledge or notice of a mining claim and an unrecorded deed. The judicial power to hold a person in contempt is an extraordinary power. Sound policy counsels against exercising that power upon one who has only constructive knowledge of the existence of the order violated.

Therefore, I would remand with instructions to the district court (a) to set aside any sanction imposed as a consequence of father's violation of the July 21 order and (b) to limit any civil contempt sanction imposed for violation of the July 20 order to damages caused to stepmother by father's violation of that order after father had knowledge of its existence.

## III. CROSS–APPEAL

I agree with the majority that stepmother's claim for custody was not properly before the district court. Although she had sought custody in earlier pleadings, she had not sought custody in any motion pending before the district court at the time of the hearings leading to the judgment on appeal. Because the district court can be affirmed on that ground, it is unnecessary to determine whether the natural mother of the children, who had visitation rights but not custody rights, was an indispensable party to a determination of the children's custody.

I also agree that we must affirm the district court's denial of visitation rights to stepmother. Although the record suggests that this result rewards father for his misconduct—making enforced visitation by stepmother so traumatic to the children that it was no longer in their best interests—the appropriate remedy in such circumstances is contempt, even criminal contempt.

Finally, I dissent from the denial of oral argument in this case.